Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued April 4, 2003        Decided June 17, 2003

No. 02-1129

SPRINT CORPORATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

SBC COMMUNICATIONS, INC., ET AL.,
INTERVENORS

————

On Petition for Review of Orders of the
Federal Communications Commission

————

*Michael Deuel Sullivan* argued the cause for petitioner Sprint Corporation and intervenor Cingular Wireless. With him on the briefs were *L. Charles Keller*, *Luisa L. Lancetti*,

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*L. Andrew Tollin* and *Carol L. Tacker*. *Jay C. Keithley* entered an appearance.

*James M. Carr*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *R. Hewitt Pate*, Acting Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, *John A. Rogovin*, Acting General Counsel, Federal Communications Commission, *John E. Ingle*, Deputy Associate General Counsel, and *Pamela L. Smith*, Counsel. *Stewart A. Block*, Counsel, entered an appearance.

*Helen M. Mickiewicz* argued the cause for intervenors People of the State of California and California Public Utilities Commission. With her on the brief was *Gary M. Cohen*.

Before: SENTELLE, ROGERS and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: This petition for review of three orders of the Federal Communications Commission arises out of the Commission's efforts to regulate the creation of telephone area codes and the allocation of telephone numbers in an equitable manner that will conserve numbering resources in the United States. *See Report & Order & Further Notice of Proposed Rulemaking, In re Numbering Res. Optimization*, 15 F.C.C.R. 7574 (2000) ("*First Order*"); *Second Report & Order, Order on Reconsideration in CC Docket No. 96–98 and CC Docket 99–200 & Second Further Notice of Proposed Rulemaking in CC Docket No. 99–200, In re Numbering Res. Optimization*, 16 F.C.C.R. 306 (2000) ("*Second Order*"); *Third Report & Order & Second Order on Reconsideration in CC Docket No. 96–98 and CC Docket No. 99–200, In re Numbering Res. Optimization*, 17 F.C.C.R. 252 (2001)("*Third Order*"); *see also Notice of Proposed Rulemaking, In re Numbering Res. Optimization*, 14 F.C.C.R. 10,322 (1999) ("*NPRM*"). At issue are the Commission's decisions to (1) lift the ban on specialized overlay area codes and consider state applications for specialized overlays on a case-by-case basis; (2) authorize states to implement rationing of tele-

phone numbers in limited circumstances; and (3) delegate some auditing authority to the states.

Sprint Corporation, joined by intervenor Cingular Wireless LLC (together, "Sprint"), challenges the Commission's decision to lift the ban on specialized overlays as contrary to law and arbitrary and capricious in view of the Commission's continuing view that the practice is discriminatory and the lack of relevant changed circumstances justifying the practice. We hold that this challenge is not ripe for judicial review, for Sprint's contentions are intertwined with how the Commission might exercise its discretion in the future. In the meantime, Sprint is free to conduct its business as it sees fit as the Commission's decision to lift the ban does not require Sprint to do or refrain from doing anything. We therefore dismiss that part of the petition as unripe. In addition, Sprint Corporation alone challenges the Commission's decisions on rationing, as contrary to Commission rules, and on auditing, as contrary to preemption of state authority. We hold that these challenges are unpersuasive and deny the remainder of the petition.

## I.

The telephone numbering system for North America, the North American Numbering Plan ("NANP"), was established in the 1940s by AT&T and created the familiar ten-digit dialing pattern for all telephone numbers, with the first three digits commonly known as the area code, and the second three digits referred to as the central office code or exchange. *Third Order*, 17 F.C.C.R. at 254 & n.1. After years of private arrangements for allocation of numbers (by the local telephone companies and a private corporation called Bellcore, *see NPRM*, 14 F.C.C.R. at 10,330; *see also In re Admin. of the North Am. Numbering Plan*, 11 F.C.C.R. 2588, 2593–94 (1995)), Congress, as part of the Telecommunications Act of 1996, Pub. L. No. 104–104, 110 Stat. 56 (1996), amended the Communications Act, 47 U.S.C. §§ 151 et seq., to vest exclusive authority in the Commission over all aspects of numbering administration in the United States, with authority to

delegate that authority to state commissions or other entities, 47 U.S.C. § 251(e)(1). Coincidently, a "numbering crisis" began to emerge in the United States with the proliferation of fax machines, modems, and wireless telephones, all demanding numbers. *See New York v. FCC*, 267 F.3d 91, 94 (2d Cir. 2001). Simultaneously, with the rise of competition in local telephone services multiple service providers required the allocation of large blocks of telephone numbers in order to be able to serve potential new customers. *See NPRM*, 14 F.C.C.R. at 10,325. Traditionally, each telephone service provider would be given at least one central office code with approximately 10,000 telephone numbers in each area code to allocate to new customers. *Id.* at 10,324–25, 10,331. With the new demands, the "exhaustion" of area codes, i.e., the allocation of all available central office codes, rapidly increased. *Id.* at 10,325, 10,331–32. To provide "area code relief" upon exhaustion of an area code, the Commission identified three alternatives that the states could adopt: (1) split the old area code geographically, with approximately half of the existing phone numbers allocated to a new area code; (2) create a new "overlay" area code that is geographically coextensive with the old area code, with all new phone numbers assigned to the new overlay code; or (3) readjust area code boundaries. *Id.* at 10,424. Each alternative might result in significant costs for consumers and telephone service providers. *Id.* at 10,332–34.

With the threat of exhaustion of all available area codes before 2010 and the enormous costs of conversion to an eleven digit system (preliminary estimates placing the cost at between $50 and $150 billion, *id.* at 10,326 n.8), the Commission turned its attention to ways to "conserve" numbering resources, *id.* at 10,326. Beginning in 2000, the Commission issued three orders designed "to slow the rate of number exhaust[ion] . . . and to prolong the life of the [NANP]." *Id.* at 10,324; *see First Order* 15 F.C.C.R. at 7578. Among the key conservation actions called for by the Commission was "thousands-block number pooling," in which service providers are allocated numbers in batches of 1,000, rather than 10,000, in order to reduce inefficient allocation of numbers and

control requests. *Second Order*, 16 F.C.C.R. at 322. Another key action was requiring service providers to demonstrate their need before additional numbers are allocated in order to end abuse of "stockpiling" unused numbers. *Id.* at 314–15. Of the various other actions aimed at conservation, only three are challenged by Sprint. The first challenge involves "specialized overlay" area codes, in which area codes are restricted for the exclusive use of certain types of technologies or services (e.g., wireless telephones). *Id.* at 359. The Commission had banned specialized overlays in 1995 and decided to reconsider its decision in 1999. *Id.* at 359–60; *NPRM*, 14 F.C.C.R. at 10,431. Under the new regime, the Commission could approve on a case-by-case basis, upon consideration of a series of factors, a new overlay area code that would be available (either temporarily or permanently) for certain kinds of telecommunications services or technologies. *Third Order*, 17 F.C.C.R. at 285–94. The second challenge involves "rationing." The Commission delegated authority to state commissions to ration the distribution of central office codes when the area code without rationing would be exhausted before an area code relief plan could be implemented; rationing can be used only where a state has ordered specific area code relief and established an implementation date, and the industry has been unable to agree on a rationing plan. *See In re Petition for Declaratory Ruling & Request for Expedited Action on the July 15, 1997 Order of the Pa. Pub. Util. Comm'n Regarding Area Codes 412, 610, 216, and 717*, 13 F.C.C.R. 19,009, 19,025–26 (1998) ("*Pennsylvania Numbering Order*"); *see also Second Order*, 16 F.C.C.R. at 333–34. The third challenge involves the scope of audits under state law pursuant to the Commission's delegation of authority. *Second Order*, 16 F.C.C.R. at 344–50; *Third Order*, 17 F.C.C.R. at 294–300.

## II.

The Commission contends, as a threshold matter, that Sprint's challenge to its decision to lift the ban on specialized overlays is not ripe for review because the Commission has yet to authorize any overlays and that Sprint lacks standing

to challenge it. According to the Commission, in light of the discretionary and case-by-case nature of its decision on specialized overlays, the need for additional facts with respect to any particular specialized overlay that the Commission might approve, and the lack of any hardship to Sprint from the Commission's decision to consider possible specialized overlays in the future, there is no need for the courts to address Sprint's challenge now. Sprint responds that the only issues it raises are legal issues, that the Commission's decision is final and binding, and that it would suffer hardship were judicial review delayed because this may be the only meaningful opportunity for judicial review if area code relief is urgently needed and an overlay is implemented before the court reaches a decision.

The seminal case of *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977), set forth two separate prongs for analysis of whether a case is ripe for judicial review: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." More recently in *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998), the Court described a three-part test: whether delay in judicial review will "cause hardship to the plaintiffs," whether "judicial intervention would inappropriately interfere with further administrative action," and "whether the courts would benefit from further factual development of the issues presented." In either event, the fundamentals of the analysis remain the same. *See United States Air Tour Association v. FAA*, 298 F.3d 997, 1013–14 (D.C. Cir. 2002), *cert. denied*, 123 S. Ct. 1783 (2003).

Fitness of the issues for judicial decision is more likely to be found where "the issue tendered is a purely legal one," *Abbott Labs.*, 387 U.S. at 149, and this court has held that the question of whether an agency decision is arbitrary and capricious is a purely legal question, *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1039 (D.C. Cir.), *opinion modified on reh'g on other grounds by* 293 F.3d 537 (D.C. Cir. 2002). Final agency action pursuant to the Administrative Procedure Act ("APA") is a "crucial prerequisit[e]" to ripeness, *Better*

*Government Association v. Dep't of State*, 780 F.2d 86, 88 (D.C. Cir. 1986); *see Abbott Labs.*, 387 U.S. at 149, and it is clear that the *Third Order* is "final" for purposes of the APA. However, issues still may not be fit for review where the agency retains considerable discretion to apply the new rule on a case-by-case basis, particularly where there is a complex statutory scheme or there are other difficult legal issues that are implicated by the agency action. *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163–64 (1967). In such circumstances, judicial review "is likely to stand on a much surer footing in the context of a specific application of [the] regulation than could be the case in the framework of [a] generalized challenge." *Id.* at 164. Guided by this instruction, this court has held that where the agency retains substantial discretion to implement its decision, the decision is not ripe for judicial review until it has been implemented in particular circumstances. *See, e.g.*, *Office of Communication of the United Church of Christ v. FCC*, 826 F.2d 101, 105–08 (D.C. Cir. 1987); *ACLU v. FCC*, 823 F.2d 1554, 1576–77 (D.C. Cir. 1987); *see also Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 940–42 (D.C. Cir. 1986). On the other hand, where the agency has replaced a prohibition or right with a discretionary process and applied its new process, the court has held that a challenge to the agency decision is ripe for judicial review: the agency has crystalized its position and to that extent it has been applied so that it has a direct and immediate impact. *See Better Gov't Ass'n*, 780 F.2d at 92–93; *cf. Media Access Project v. FCC*, 883 F.2d 1063, 1070–71 (D.C. Cir. 1989).

The fundamental purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality v. Dep't of the Interior*, 71 U.S.L.W. 4399, 4400 (U.S. May 27, 2003) (quoting *Abbott Labs.*, 387 U.S. at 148–49). Sprint's challenge to the Commission's decision to lift the ban on specialized overlays

rests on the ground that the Commission did not adequately explain its change from an absolute ban to a discretionary review process and that circumstances have not adequately changed to justify the Commission's change in position. So understood, Sprint's challenge focuses on whether the Commission unlawfully reached its decision, i.e., whether it might ever be able lawfully to exercise its discretion to approve a specialized overlay, such that the court would review whether the Commission has provided a reasonable explanation for why such discretion might be necessary. *See Natural Res. Def. Council, Inc. v. United States Envtl. Prot. Agency*, 859 F.2d 156, 168 (D.C. Cir. 1988).

To determine whether the Commission has adequately explained its changed position, however, would require the court to address Sprint's claims that the discriminatory flaws of specialized overlays that were identified by the Commission in imposing the ban are still present, and that specialized overlays will not be viable in the near future because the Commission is about to implement number portability allowing users of both landline and wireless telephones to switch their service without changing their telephone number. These claims concern how the Commission might improperly exercise its discretion in the future. Because the Commission has reserved judgment on whether to approve any specialized overlays that might mandate "take backs" (requiring wireless consumers to change their phone numbers) or that might result in inefficient uses of numbering resources, resolution of Sprint's claims will depend on the concrete facts of a particular specialized overlay proposal. As for number portability, because (at the time of the Orders on review) the Commission concluded that number portability was a requirement for thousands-block number pooling, *Second Order*, 16 F.C.C.R. at 363, its analysis of whether specialized overlays should be restricted to non-pooling service providers and phased out when pooling is introduced, *Third Order*, 17 F.C.C.R. at 288–91, also left the question to future case-by-case decisionmaking. In a future decision by the Commission to approve, disapprove, or approve with conditions a specialized overlay proposal, these concerns might well be addressed, and the

Commission as a result might never apply the specialized overlay exception in a manner that will harm Sprint. *See, e.g., Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1296–97 (D.C. Cir. 2000). Indeed, Sprint conceded during oral argument that if the specialized overlays were limited to phone numbers that were not tied to particular geographic locations, such as ATMs, faxes, or OnStar services, it might suffer no injury.

In the end, while Sprint's contention that the Commission has not adequately explained its decision to lift the ban might theoretically be ripe for review on its own, the success of its challenge, which is based on claims of discriminatory effect and inefficiency, will depend in large part on the particular specialized overlays that the Commission might approve in the future. In light of the Commission's enumeration of the factors it will consider in evaluating a specialized overlay proposal, factors reflecting Sprint's concerns, the Commission might approve a proposal in a manner such that Sprint's concerns may never be realized. We therefore conclude that Sprint's general challenge to the Commission's decision to lift the ban is not readily detached from its contentions in support of that general challenge. *Office of Communication*, 826 F.2d at 108. By declining to decide Sprint's general challenge now, we "preserve 'our own ability to decide intelligently,'" *id.* (quoting *Am. Trucking Ass'ns v. ICC*, 747 F.2d 787, 790 (D.C. Cir. 1984)), not only Sprint's challenge but any future challenges to specific specialized overlay proposals. *See also Midwestern Gas Transmission Co. v. FERC*, 589 F.2d 603, 620 (D.C. Cir. 1978)*; cf. Natural Res. Def. Council*, 859 F.2d at 168; *Ark. Power & Light Co. v. ICC*, 725 F.2d 716 (D.C. Cir. 1984).

With respect to hardship, until and unless the Commission approves a specialized overlay proposal, Sprint is "free to conduct its business as it sees fit," *Nat'l Park Hospitality Ass'n*, 71 U.S.L.W. at 4401. Nor are there any "adverse effects of a strictly legal kind" from the Commission's Orders, because the decision to lift the ban "does not command anyone to do anything, or to refrain from doing anything; it does not grant, withhold, or modify any formal legal license,

power, or authority; it does not subject anyone to any civil or criminal liability; and it creates no legal rights or obligations," *id.* (quoting *Ohio Forestry Ass'n*, 523 U.S. at 733). Unnecessary uncertainties and costs associated with challenging future specialized overlay proposals are not expenses of the kind "sufficient by itself to justify review in a case that would otherwise be unripe." *Ohio Forestry Ass'n*, 523 U.S. at 734–35; *see also Webb v. Dep't of Health & Human Servs.*, 696 F.2d 101, 107 & n.40 (D.C. Cir. 1982). Sprint's suggestion that there may not be time for judicial review in the future because of the urgency of area code relief proceedings ignores the possibility of judicial stays and expedited review, or, where a specialized overlay has already been implemented by a state, conversion of the specialized overlay to an all-services overlay after the fact. *See Office of Communication*, 826 F.2d at 109.

For these reasons, we hold that Sprint's challenge to the Commission's decision to lift the ban on specialized overlays is not ripe for judicial review, and we dismiss that part of the petition.

### III.

Sprint also challenges the Commission's decisions authorizing states to implement rationing of telephone numbers and authorizing state auditing. Consistent with our standard of review that examines whether the Commission's orders are arbitrary or capricious, an abuse of discretion, or contrary to law, *see United States Telecom Ass'n v. FCC*, 227 F.3d 450, 461 (D.C. Cir. 2000), we hold that Sprint's challenges are unpersuasive.

### A.

As a threshold matter, we reject the contention of the California Public Utilities Commission ("CPUC") as intervenor that Sprint's challenge to state rationing is moot. CPUC asserts that "the need for rationing has been all but eliminated," Intervenor's Br. at 17, as wireless carriers have entered into thousands-block number pooling as of November 2002.

However, CPUC's brief shows that the need for rationing has not been entirely eliminated, for it is careful to state that "the need for rationing has been *all but* eliminated," and that "rationing will *most likely* be unnecessary." Intervenor's Br. at 17–18 (emphasis added). Moreover, Sprint points out that pooling is only occurring in some geographic areas in the United States.

Sprint interprets the Commission's orders as establishing a blanket rule that numbers should only be allocated on a needs-based, first-come, first-served basis, and that rationing is an unexplained violation of this principle. Yet Sprint does not dispute that states were authorized to undertake rationing in the *Pennsylvania Numbering Order*, which preceded the Orders on review. Further, in the *Second Order*, the Commission referred to rationing as an authority that had been delegated to states. 16 F.C.C.R. at 331–34; *see also Third Order*, 17 F.C.C.R. at 293–94.

Thus, even though the *First Order* did not refer to rationing in developing the needs-based, first-come, first-served principles for general number allocation, there is no conflict between the rationing rules in the *Pennsylvania Numbering Order* and the allocation principles developed in the *First Order*. In the *First Order*, the Commission developed new principles for the general allocation of numbers, but did not disturb its authorization in the *Pennsylvania Numbering Order* for states to use rationing in specified exigent circumstances. *See* 15 F.C.C.R. at 7610–21. That is confirmed by Sprint's characterization of the *Second Order* as mentioning rationing without stating that it had been eliminated.

The Commission defends the reasonableness of its decision by emphasizing the limited circumstances in which it has authorized rationing, i.e., where an area code will be exhausted before timely and expeditious implementation of an already developed area code relief plan and where industry has been unable to develop a plan to allocate remaining numbers. *See Second Order*, 16 F.C.C.R. at 333–34. Sprint does not dispute that, in order to qualify for rationing, a service provider must first show need. Further, the Commission

emphasizes that in the extreme circumstances when rationing is authorized, the lottery that most rationing programs use is necessary to distribute extremely limited numbering resources in a more equitable manner than first-come, first-served distribution. Under the circumstances, we conclude that the Commission adequately developed its rationale that rationing is superior to first-come, first-served distribution in exigent circumstances in the *Pennsylvania Numbering Order* when it stated that there is a need to ensure distribution on "an equitable basis until [a] new area code is introduced." 13 F.C.C.R. at 19,026. Not only is rationing permissible under current Commission policy but Sprint's position would result in a race-to-the-regulator filing system when area codes are about to be exhausted, potentially resulting in an inefficient and inequitable distribution of numbers among carriers who have demonstrated a need for numbers.

Although we conclude, contrary to the Commission's brief, that Sprint preserved in comments to the Commission its contention that a rationing system is a state barrier to entry in violation of 47 U.S.C. § 332(c)(3)(A), the contention fails. Section 332(c)(3)(A) generally prohibits a state or local government from "regulat[ing] the entry of or the rates charged by any commercial mobile [phone] service." However, Commission policy requires states to establish a "safety valve" that grants numbering resources to providers that otherwise would have no opportunity to enter into the telecommunications market. *See Second Order*, 16 F.C.C.R. at 330–31; *Third Order*, 17 F.C.C.R. at 279–82; *see also Second Order*, 16 F.C.C.R. at 334, 343; *Pennsylvania Numbering Order*, 13 F.C.C.R. at 19,039. While Sprint may object that the safety valve provision is inadequate to ensure that carriers' needs are met, that issue is best addressed in the context of a specific proposal rather than in a general challenge to the Commission's regulations. *See Toilet Goods Ass'n*, 387 U.S. at 163–64; *Ark. Light & Power*, 725 F.2d at 725.

Sprint's other rationing objections fail. The Commission was not required to respond in the Orders to Sprint's conclusory comments that § 332(c)(3)(A) prevents rationing because rationing "constitute[s] entry regulation that the Act prohib-

its." Petitioner's Br. at 37; *cf. Reytblatt v. United States Nuclear Regulatory Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997). As for Sprint's general contention that the Commission's rationing decision is inconsistent with a first-come, first-served, needs-based distribution system, the Commission "need not address every comment," but need only "respond in a reasoned manner to those [comments] that raise significant problems" in order to refute a conclusion that "the agency's decision was not based on a consideration of the relevant factors." *See City of Waukesha v. EPA*, 320 F.3d 228, 257–58 (D.C. Cir. 2003) (quotations omitted). As discussed, there was no inconsistency that required a response. Also, Sprint's passing references that rationing is not "equitable," in violation of 47 U.S.C. § 251(e)(1), either state an "asserted but unanalyzed" claim that is not properly presented to the court, *see City of Waukesha*, 320 F.3d at 254, or fail to consider that a § 251(e)(1) claim based on alleged disparate treatment by rationing programs of wireless carriers that do not participate in pooling is met by the expansion of pooling to most wireless carriers in November, 2002. *See Second Order*, 16 F.C.C.R. at 328–30 & n.126; *Third Order*, 17 F.C.C.R. at 263 & n.51; *In re Verizon Wireless's Petition for Partial Forbearance from the Commercial Mobile Radio Servs. Number Portability Obligation*, 17 F.C.C.R. 14,972, 14,981–83, 14,986 (2002). Moreover, Sprint fails to explain how the random assignment of limited numbers by lottery is, in general, any less equitable than assignment on a first-come, first-served basis.

**B.**

Regarding state audits, Sprint contends that § 251(e)(1) has preempted all state authority in telephone numbering administration, and consequently, the Commission's attempt to authorize state audits is unlawful. Section 251(e)(1) does provide that the Commission has "exclusive jurisdiction over those portions of the [NANP] that pertain to the United States." 47 U.S.C. § 251(e)(1). But it also provides that "[n]othing in this paragraph shall preclude the Commission from delegating to State commissions or other entities all or any portion of such jurisdiction." *Id.* The only question then

is what audit authority the Commission has delegated to state commissions.

The Commission declined in the *Second Order* "to delegate authority to the states to conduct" audits of service providers' use of telephone numbers or compliance with the numbering regulations. 16 F.C.C.R. at 347. The Commission also stated, however, that "[i]n declining to delegate authority to states to perform audits under the national program, we do not intend to preempt any state authority to perform audits under state law." *Id.* In the *Third Order* the Commission stated that:

> in recognition that states can serve a valuable role in helping the Commission to monitor carriers' number use, we clarify that states may conduct audits, at their own expense, to determine whether a particular carrier is in compliance with the Commission's numbering rules to discharge their own responsibilities. For example, state audits that seek to gather information needed to facilitate area code relief decisions would be appropriate to the extent that the information sought is not available through another source.

17 F.C.C.R. at 297. Although the Commission did not use the word "delegate," it is clear that the Commission was referring to its prior delegation to state commissions. In the *First Order*, the Commission addressed whether states could require regular reporting of data from service providers with respect to number utilization:

> We will not delegate authority to the states to impose additional regularly scheduled reporting requirements on any carriers. Such independent authority would undermine the purpose of establishing regularly scheduled federal reporting requirements, namely a uniform standard that all carriers could use in their record keeping and reporting activities.... Thus, we supersede the authority specifically delegated to some states to require such reporting. We do not intend, however, to supplant

> independent state authority exercised pursuant to state law unrelated to number administration, but we encourage state commissions to rely on the reporting requirements that we adopt herein. Moreover, we do recognize that from time to time a state may need to audit a specific carrier and will need access to more granular data. Therefore, our prohibition on state-ordered reporting does not apply in instances where states need to gather data for a specific purpose, as long as these data reporting requirements do not become regularly scheduled state-level reporting requirement[s].

16 F.C.C.R. at 7606–07. Moreover, the Commission specifically granted authority to state commissions to "investigate and determine whether code holders have 'activated' [central office codes] assigned to them within the time frames specified." 15 F.C.C.R. at 7680.

Considering the *First Order* and *Third Order* together, we agree with the Commission's statement in its brief that the Commission did not intend to prevent state commissions from performing audits in areas in which the Commission has delegated authority to the state commissions to the extent that the commissions have auditing authority under state law. Respondent's Br. at 36–38. Examples discussed in the Orders are area code relief, where the Commission has delegated authority to state commissions, *see, e.g.*, *Third Order*, 17 F.C.C.R. at 297, and utilization reports, which are necessary in order for the states "to meet their obligations with respect to area code relief," *First Order*, 15 F.C.C.R. at 7606. Because this analysis is sufficiently developed in the Orders on review, Sprint's post hoc attack fails. Moreover, to the extent that Sprint responds that state audits might serve no particular purpose because of the conditions that the Commission has imposed, *see Third Order*, 17 F.C.C.R. at 297, or that state audits might pose an unnecessary burden on its operations, its challenge is unripe as a response will depend on the particular context of a state audit. *See Beach Communications, Inc. v. FCC*, 959 F.2d 975, 983–85 (D.C. Cir. 1992); *see also Atl. States Legal Foundation v. EPA*, 325 F.3d 281, 284–

85 (D.C. Cir. 2003). Sprint has identified no hardship that it would suffer in leaving such objections to a case-by-case review.

Accordingly, we dismiss that part of the petition for review in which Sprint's challenge is not ripe for judicial review and we deny the remainder of the petition.