NATIONAL ASSOCIATION OF HOME BUILDERS, et al., Plaintiffs,

v.

U.S. ARMY CORPS OF ENGINEERS, et al., Defendants.

No. CIV.A. 01–0274(JR).

United States District Court, District of Columbia.

March 31, 2004.

Virginia Swisshelm Albrecht, Hunton & Williams, Rafe Petersen, Holland & Knight, LLP (DC), Washington, DC, for Plaintiff.

Scott Jeffrey Jordan, United States Department of Justice, Washington, DC, for Defendant.

Howard Irving Fox, Earthjustice Legal Defense Fund, Washington, DC, for Intervenor Defendant.

William P. Horn, Birch, Horton, Bittner & Cherot, Washington, DC, for Amicus.

## MEMORANDUM

ROBERTSON, District Judge.

Plaintiffs challenge a regulation issued by the Army Corps of Engineers and the Environmental Protection Agency dealing with the discharge of dredged material into waters of the United States. The challenge asserts that the agencies have exceeded their authority under the Clean Water Act, the Administrative Procedure Act, and the Tenth Amendment. This matter is before me on plaintiffs' motions for summary judgment, defendants' cross-motion for summary judgment, and defendant-intervenors' cross-motion for summary judgment. The Court also has considered the parties' submissions of supplemental authority and the *amicus curiae* brief filed by the Pacific Legal Foundation. Having reviewed the entire record, I find that the merits controversy presented by this record is not ripe for judicial review. Plaintiffs also make a procedural challenge, contending that the Corps of Engineers and the EPA violated the APA by failing to seek notice and comment on certain language of the regulation. That procedural challenge does not appear to be well taken, but it will not be ruled upon at this time.

## BACKGROUND

Congress passed the Clean Water Act ("CWA") in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The key enforcement provision of the CWA is section 301, which declares "any discharge of any pollutant by any person" unlawful, unless the discharge is pursuant to a permit. § 1311(a). "Discharge" is defined as "any addition of any pollutant to navigable waters from any point source." § 1362(12).[1] Authority to enforce the CWA is shared by the Envi-

---

1. The term "pollutant," as defined in the CWA, includes "dredged spoil," "solid waste," "rock," "biological materials," "sand," and "cellar dirt." § 1362(6). Earth that is removed during ditching and other landclearing operations is also considered a "pollutant" under the CWA. *See Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 922 (5th Cir.1983). The term "point source" is defined as any "discernable, confined and discrete conveyance...from which pollutants are or may be discharged." 33 U.S.C. 1362(14). Bulldozers, dumptrucks, and other earth-moving equipment are "point

ronmental Protection Agency (EPA) and the Army Corps of Engineers (the "Corps"). Pursuant to CWA section 402, the EPA is authorized to issue permits for the discharge of pollutants into navigable waters, provided the discharge meets CWA requirements. This permit system, which is not of central concern in this case, is known as the National Pollutant Discharge Elimination System (NPDES). § 1342.

■ A separate provision, section 404, authorizes the Corps to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." § 1344. One of the central regulatory goals of section 404 is to protect the nation's wetlands.[2] In 1986, the Corps issued a regulation that defined the term "discharge of dredged material" to mean "any addition of dredged material into the waters of the United States," while expressly excluding "*de minimis,* incidental soil movement occurring during normal dredging operations." 51 Fed. Reg. 41,206, 41,232 (Nov. 13, 1986). The Corps acknowledged that dredging cannot be performed without some fallback and observed that, if it were to define such fallback as "discharge," it would be asserting jurisdiction over dredging, which it did not

(at the time) believe was the intent of Congress. *Id.* at 41,210. In 1990, however, the Corps changed course, issuing a guidance letter stating its "position that mechanized landclearing activities in jurisdictional wetlands result in a redeposition of soil that is subject to regulation under section 404." United States Army Corps of Eng'rs Regulatory Guidance Letter 90–5 (Jul. 18, 1990). Three years later, as part of a settlement agreement reached between the Corps and environmental interests in *California Wildlife Federation v. Tulloch,* Civ. No. C90–713–CIV–5–BO (E.D.N.C.1996), the Corps issued a regulation that eliminated the *de minimis* exception promulgated in 1986. Instead, the so-called "Tulloch rule" redefined "discharge of dredged material" to include redeposits of material incidental to activities such as mechanized landclearing and excavation:

> [A]ny addition, including any redeposit, of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation.

58 Fed.Reg. 45,008, 45,035 (Aug. 25, 1993).[3]

Industry groups, among them the National Association of Home Builders

---

sources." *United States v. Tull,* 615 F.Supp. 610 (E.D.Va.1983).

**2.** The jurisdictional touchstone of the CWA is that the act only prohibits discharges into the "navigable waters," 33 U.S.C. § 1362(12), defined elsewhere as the "waters of the United States," § 1362(7). Certain wetlands qualify as "waters of the United States." *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 133, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); *see also Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs,* 531 U.S. 159, 167, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001).

**3.** The Tulloch rule also attempted to shift the burden of proof to the regulated community:

Section 404 authorization is not required for . . . any incidental addition, including redeposit, of dredged material associated with any activity that does not have or would not have the effect of destroying or degrading an area of waters of the United States. . . . [H]owever, this exception does not apply to any person preparing to undertake mechanized landclearing, ditching, channelization and other excavation activity in a water of the United States, which would result in a redeposit of dredged material, unless the person demonstrates to the satisfaction of the Corps, or EPA as appropriate, prior to commencing the activity involving the discharge, that the activity would not have the effect of destroying or degrading any area of waters of the United States. . . *The person proposing to undertake mechanized land-*

(NAHB), challenged the Tulloch rule. Plaintiffs argued, essentially, that the rule exceeded the agencies' authority under the CWA, because section 404 only applies to "discharge," which is statutorily defined as the *"addition* of any pollutant to the navigable waters." Judge Harris agreed, in *American Mining Congress v. United States Army Corps of Engineers,* 951 F.Supp. 267, 270–71 (D.D.C.1997) [hereinafter *AMC*] (emphasis added). He found no case law addressing the narrow question of whether incidental fallback constitutes a discharge, concluded that Congress did not intend for either section 301 or section 404 to cover incidental fallback, declared the rule invalid, and enjoined the agencies from applying or enforcing it. *Id.* at 277. The D.C. Circuit affirmed, *National Mining Association v. United States Army Corps of Engineers,* 145 F.3d 1399, 1404 (1998) [hereinafter *NMA*], agreeing that the rule was contrary to the statutory language:

> We agree with the plaintiffs, and with the district court, that the straightforward statutory term "addition" cannot reasonably be said to encompass the situation in which material is removed from the waters of the United States and a small portion of it happens to fall back. Because incidental fallback represents a net withdrawal, not an addition, of material, it cannot be a discharge.

The panel gave the Corps some guidance on how to restructure its rulemaking:

> [W]e do not hold that the Corps may not legally regulate some forms of redeposit under its § 404 permitting authority. We hold only that by asserting jurisdiction over "any redeposit," including incidental fallback, the Tulloch Rule outruns the Corps's statutory authority. Since the [CWA] sets out no bright line be-

tween incidental fallback on the one hand and regulable redeposits on the other, a reasoned attempt by the agencies to draw such a line would merit considerable deference. But the Tulloch Rule makes no effort to draw such a line, and indeed its overriding purpose appears to be to expand the Corps's permitting authority to encompass incidental fallback and, as a result, a wide range of activities that cannot remotely be said to "add" anything to the waters of the United States.

*Id.* at 1405.

In 1999, the agencies promulgated an interim rule that defined "discharge of dredged material" to include:

> [A]ny addition, including redeposit other than incidental fallback, of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation.

64 Fed.Reg. 25,120, 25,123 (May 10, 1999). NAHB and others moved to compel compliance with the 1997 *AMC* injunction. Judge Harris denied the motion, *American Mining Congress v. United States Army Corps of Engineers,* 120 F.Supp.2d 23 (D.D.C.2000), finding the interim rule "facially consistent with the Court's injunction," and noting in particular that "the rule makes clear that the agencies may not exercise § 404 jurisdiction over redeposits of dredged material to the extent that the redeposits involve only incidental fallback." *Id.* at 29. Judge Harris noted that the agencies planned to make a "reasoned attempt to more clearly delineate the scope of CWA jurisdiction over redeposits of dredged material" through notice and comment rulemaking, *id.,* and approved the

---

*clearing, ditching, channelization or other excavation activity bears the burden of demonstrating that such activity would not de-*

*stroy or degrade any area of waters of the United States.*

58   Fed.Reg. at 45,036 (emphasis added).

agency's interim approach—to determine on a case-by-case basis whether a particular redeposit constitutes incidental fallback, *id.* (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) (agency may choose between proceeding by general rule or adjudication)).

In 2000 the Corps and EPA proposed a rule that added the following text to the definition of "discharge of dredged material":

> A discharge of dredged material shall be presumed to result from mechanized landclearing, ditching, channelization, instream mining, or other mechanized excavation activity in waters of the United States. This presumption is rebutted if the party proposing such an activity demonstrates that only incidental fallback will result from its activity.

65 Fed.Reg. 50,108, 50,117 (Aug. 16, 2000); 33 C.F.R. § 323.2, 40 C.F.R. § 232.2.

In January 2001, after reviewing comments from the public and interested parties,[4] the agencies issued their final rule (Tulloch II) amending the definition of "discharge of dredged material" by adding:

> The Corps and EPA *regard* the use of mechanized earth-moving equipment to conduct landclearing, ditching, channelization, in-stream mining or other earth-moving activity in waters of the United States as resulting in a discharge of dredged material unless project-specific evidence shows that the activity results in only incidental fallback. This paragraph does not and is not intended to shift any burden in any administrative or judicial proceeding under the CWA.

66 Fed.Reg. at 4,575 (emphasis added). This revised text abandoned the "rebuttable presumption" of the draft rule in favor of language that the agencies felt better captured their stated intent

> to express our expectation that the activities in question typically result in regulable discharges, not to create a formal new process or record keeping requirements . . . . To make this point unmistakably clear, we also have added a new sentence to the rule language that expressly provides the rule does not and is not intended to shift any burden in any administrative or judicial proceeding under the CWA. In addition, the rule language has been clarified to make it more evident that we will not look to project proponents alone to provide information that only incidental fallback results.

*Id.* at 4,552.

Comments from the industry asked for a definition of the term "incidental fallback." The agencies obviously had difficulty formulating a precise response:

> Incidental fallback is the redeposit of small volumes of dredged material that is incidental to excavation activity in waters of the United States when such material falls back to substantially the same place as the initial removal. Examples of incidental fallback include soil that is disturbed when dirt is shoveled and the back-spill that comes off a bucket when such small volume of soil or dirt falls into substantially the same place from which it was initially removed.

*Id.* at 4,575. Rejecting suggestions to draw "a bright line on the basis of measurable criteria," the agencies decided that "an actual decision about whether a particular activity results in a discharge needs to be made on a case-by-case basis consider-

---

4. The agency received 9,650 comments. Of those, approximately 9500 were form letters from the general public expressing overall support for the rule. The remaining 150 were from organizations, governmental entities, or commercial interests. Of these, 75 were "detailed comments," two-thirds of which were opposed to the rule. 66 Fed.Reg. 4,550, 4,551–52 (Jan. 17, 2001).

ing actual evidence of the particular activity in question," *id.* at 4562.

Although consideration of factors such as the volume and amount of the material and nature and distance of relocation are relevant in determining whether incidental fallback or a regulable discharge occurs, these factors are intertwined with one another, and do not lend themselves to a segregable hard and fast quantification of each specific factor (or combination of factors) so as to give rise to a hard and fast test. Moreover, we are not aware of, nor have commenters suggested, a sound technical or legal basis on which to establish brightline quantifiable limits on such factors. For example, we do not believe it is technically sound or feasible to simply establish universally applicable cut-off points for amount or distance.

*Id.* at 4,566.

Plaintiffs filed this suit on February 6, 2001. Proceedings were stayed upon consent while the parties held settlement talks and awaited the Supreme Court's decision in *Borden Ranch Partnership v. United States Army Corps of Engineers,* 537 U.S. 99, 123 S.Ct. 599, 154 L.Ed.2d 508 (2002). The settlement talks apparently failed, and the parties agreed to a schedule for briefing their cross-motions. Plaintiffs' motion asserts that Tulloch II(1) improperly expands the scope of the agencies' jurisdiction under the CWA, (2) violates the holdings of *AMC* and *NMA,* (3) and is arbitrary and capricious and otherwise unlawful under the APA; (4) that the agencies provided inadequate notice of the rule in violation of the APA; and (5) that the rule violates the United States Constitution. The motion of the federal defen-

dants asserts, *inter alia,* that this case is not ripe for decision, because it brings a facial challenge to a rule that is meant to be applied on a case-by-case basis.[5]

## ANALYSIS

### I. Ripeness

■ The ripeness requirement is a doctrine of justiciability that is designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148–149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). In deciding whether a challenge to an agency's decision is ripe for review, I must examine both the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. 1507. In this Circuit, a balancing test has evolved: "In order to outweigh institutional interests in the deferral of review, the hardship to those affected by the agency's action must be immediate and significant." *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler,* 789 F.2d 931, 940 (D.C.Cir.1986).[6]

#### A. *Fitness*

■ The fitness inquiry has two steps. I must first consider whether the issues raised in the complaint are purely legal, in which case they are presumptively reviewable. *Nat'l Mining Ass'n v. Fowler,* 324 F.3d 752, 757 (2003). I agree with plain-

---

**5.** Intervenor defendants also argue that the rule in question is reviewable only by the Court of Appeals and that plaintiffs lack standing. I need not and do not address either argument at this time.

**6.** Other formulations of this rule require immediate, direct, and significant harm. *Cronin v. FAA,* 73 F.3d 1126, 1133 (D.C.Cir.1996).

tiffs that this case does involve purely legal issues of the propriety of a regulation under the CWA, the APA, and the Constitution. *See, e.g., Sprint v. FCC*, 331 F.3d 952, 956 (D.C.Cir.2003) (the question of whether an agency decision is arbitrary and capricious is a "purely legal question").

■■ Next, I am to consider whether the agency or the court will "benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Fowler*, 324 F.3d at 757. Finality is not a problem—Tulloch II was published as a final rule in the Federal Register after notice and comment. *See Sprint*, 331 F.3d at 956 (final agency action pursuant to the APA is a "crucial prerequisite" to ripeness). But, both the court and the agencies would benefit from letting the questions presented here "arise in some more concrete and final form." *State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 479 (D.C.Cir.1986). This is particularly true because Tulloch II sets up a framework for deciding on a case-by-case basis whether a permit will be required. An issue may not be fit for review

> where the agency retains considerable discretion to apply the new rule on a case-by-case basis, particularly where there is a complex statutory scheme or there are other difficult legal issues that are implicated by the agency action. In such circumstances, judicial review is likely to stand on a much surer footing in the context of a specific application of the regulation than could be the case in the framework of a generalized challenge.

*Sprint*, 331 F.3d at 956 (citing *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163–64, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967)) (internal quotations omitted). *Compare Sprint*, 331 F.3d at 962 (general challenge to rule not ripe where agency decided to make decisions on a case-by-

case basis, guided by a set of factors), *with Action Alliance*, 789 F.2d at 940 (action ripe in part because no application of provision was possible), *and Natural Resources Def. Council v. EPA*, 859 F.2d 156, 168 (D.C.Cir.1988) (challenge to EPA's authority to attach certain conditions to permits ripe, even though there was a question of whether EPA would actually attach such conditions, in part because EPA asserted authority to attach the conditions in preamble to rule and in oral argument).

■ In this case, the agencies maintain that determining what is a regulable discharge will require project-specific, case-by-case analysis:

> [T]he determination of whether an activity results in a regulable discharge of dredged material or produces only incidental fallback involves consideration of the location and the amount of the redeposit. Because of the fact-specific nature of the assessment of these factors, and their interrelated nature, we do not believe it to be feasible or appropriate to establish hard and fast cut-off points for each of these factors. Rather, the totality of the factors will be considered in each case.

66 Fed.Reg. at 4553. Where an agency has instituted a case-by-case decisionmaking process, a challenge to the agency decision should be ripe for judicial review only when the agency has applied its process and thereby "crystalized its position." *Sprint*, 331 F.3d at 957.

It is clear that the agencies may legally regulate some forms of redeposit, and equally clear that they cannot regulate "incidental fallback." *NMA*, 145 F.3d at 1405. Between these two lines is a gray area. The agencies have expressed their intent to regulate in this gray area, but not to step over the "incidental fallback" line. "Prudence restrains courts from hastily intervening into matters that may best be reviewed at another time or another set-

ting, especially when the uncertain nature of an issue might affect a court's ability to decide intelligently." *Wyoming Outdoor Council v. United States Forest Serv.,* 165 F.3d 43, 50 (D.C.Cir.1999); *see also Clean Air Implementation Project v. EPA,* 150 F.3d 1200, 1205 (D.C.Cir.1998) (where court could not be sure whether agency evidentiary rule would actually alter requirements on the ground, "too many imponderables" warranted delay until enforcement action provided further factual development). To attempt to disentangle the permissible from the impermissible without the benefit of a real-world example (or several) would not do justice to these complex and important legal questions. Until the rule is applied to a set of facts, the Court can do no more than "theoriz[e] about how [the] rule will be applied and what its effect will be." *Diamond Shamrock Corp. v. Costle,* 580 F.2d 670, 673 n. 1 (D.C.Cir.1978); *see also, Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 891, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (regulation not ordinarily ripe for judicial review "until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.").

B. *Hardship*

■ Analysis of the hardship element begins with the Supreme Court's holding in *Toilet Goods Association v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), the companion case to *Abbott Labs. Toilet Goods* stands for the proposition that hardship for the purposes of ripeness exists only if the challenged administrative action would have an immediate effect on the primary conduct of the petitioner. *Id.* at 164, 87 S.Ct. 1520. Such hardship was found in *Abbott Labs.,* where petitioners were challenging a regulation that would have required them to immediately change all of their promotional material and labeling or risk prosecution. 387 U.S. at 152–53, 87 S.Ct. 1507.

■ Plaintiffs' chief complaint of hardship is that Tulloch II forces their members to subject themselves to the costs and delays of applying for permits. Plaintiffs further argue that, even if their members can show, through project-specific evidence, that no regulated activity is occurring, they will still have been harmed by the costs of proceeding through the regulatory process. *See generally* Desiderio Decl. Moreover, plaintiffs point out that Tulloch II introduces uncertainty into long-term planning processes critical to many of the businesses they represent. *See* Carroll Decl., at ¶ 13. In sum, plaintiffs contend that they face the same "Hobson's choice" as the petitioners in *Abbott Labs.:* proceed without a permit and risk civil or criminal fines, or go through the costly permitting process.

But plaintiffs' situation is distinguishable from that faced by the petitioners in *Abbott Labs.* There, the "regulations [were] clear-cut, and were made effective immediately upon publication.... [Moreover the] agency's counsel represented...that immediate compliance with their terms was expected." *Id.* at 152, 87 S.Ct. 1507. Tulloch II, in contrast, merely explains how the agencies will evaluate mechanized earth-moving activities on a case-by-case basis. The rule does not establish new requirements or procedures. It requires no new submissions from or actions by the plaintiffs. It does not require anyone "to engage in, or refrain from, any conduct." *Clean Air,* 150 F.3d at 1204–05 (citing *Texas v. United States,* 523 U.S. 296, 301, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998)). Any potentially regulated party has the opportunity to challenge specific determinations by the Corps by appealing a permit decision or raising a defense in an enforcement action. *See Clean Air,* 150

F.3d at 1205.[7]  Plaintiffs' desire for certainty and clarity is acknowledged and respected, but as a legal matter they do not face "immediate and significant" hardship. *Action Alliance*, 789 F.2d at 940. The uncertainty of not knowing exactly how or when the agencies will require a permit for their excavation-type activities in wetlands is not hardship for purposes of a ripeness inquiry. *Diamond Shamrock*, 580 F.2d at 673 n. 1 (rejecting industry claims of hardship based on the uncertainties allegedly caused by requirements that might be included in permits yet to be issued); *see also Tenn. Gas Pipeline Co. v. FERC*, 736 F.2d 747, 750 (D.C.Cir.1984) (speculative or hypothetical future harm does not equate to hardship for the purposes of the ripeness analysis). Nor does the possibility that a party may incur the expense of challenging a regulation in an enforcement proceeding at some point in the future constitute hardship. *Clean Air*, 150 F.3d at 1204–1205 ("burden of participating in future proceedings does not constitute sufficient hardship for the purposes of ripeness").

Plaintiffs cite two recent cases, *National Park Hospitality Association v. Department of the Interior*, 538 U.S. 803, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003), and *CropLife America v. EPA*, 329 F.3d 876 (D.C.Cir.2003), in support of their argument that the claims before me are ripe. The cases actually support the opposite conclusion. In *National Park*, the Supreme Court reviewed a challenge to a Park Service regulation that declared contracts between concessioners and the Service not subject to the Contracts Disputes Act (CDA). *Id.* at 2029. This regulation conflicted with rulings of the Department of Interior's Board of Contract Appeals, which had previously held that such contracts were subject to the CDA. *Id.* In this context, the Court found that the Park Service regulation was simply a general policy stating the Park Service's view of how the CDA should apply to its contract disputes. *Id.* at 2031. Because the concessioner remained "free to conduct its business as it sees fit," the Court found it appropriate to delay review on ripeness grounds. *Id.* at 2027.

The concessioners in *National Parks* had argued that delaying judicial resolution would result in "real harm because the applicability *vel non* of the CDA is one of the factors a concessioner takes into account when preparing its bid for NPS concession contracts." *Id.* at 2032. The Court reasoned that "mere uncertainty as to the validity of a legal rule [could not] constitute a hardship for purposes of the ripeness analysis," in part because, if the Court were to adopt the concessioners' logic, "courts would soon be overwhelmed with requests for what essentially would be advisory opinions because most business transactions could be priced more accurately if even a small portion of existing legal uncertainties were resolved." *Id.* Plaintiffs' argument that their harm goes beyond uncertainty is not persuasive.[8]

---

7. On a related note, plaintiffs argue that Tulloch II shifts the burden of proof because now plaintiffs will have to contact the Corps each time they wish to disturb the soil. The agencies maintain that this is not the case. Potentially regulated parties may proceed without a permit. Should the Corps' eventually bring an enforcement action, the party may challenge the Corps' jurisdiction at that time.

8. Amicus Pacific Legal Foundation (PLF) suggests, darkly, that the case-by-case approach taken in Tulloch II is a ploy to disguise a hidden agenda to regulate water bodies "clearly beyond the scope of the CWA." PLF Br., at 7. PLF further suggests that it is quite clear how the agencies will develop their case-by-case rulings, pointing to the controversial case of *Borden Ranch Partnership v. United States Army Corps of Engineers*, 261 F.3d 810 (9th Cir.2001), in which the Corps cited a landowner for discharging dredged material when he utilized a tillage practice

In *CropLife America*, the D.C. Circuit heard a challenge to an EPA directive that had been published in a press release. 329 F.3d at 879–882. The directive stated that the EPA would no longer consider or rely on "third-party" human research studies in its regulatory decisionmaking, reversing EPA's prior approach, which was to consider data from these third-party studies on a case-by-case basis under strict standards.[9] EPA argued that the challenge was not ripe because "an ALJ, the Administrator or the EAB may allow a third-party study into evidence in a hearing process or the Administrator may make a 'legal requirement' determination in a rulemaking." *Id.* at 884. The D.C. Circuit rejected this argument, noting that the press release had stated "unequivocally that the agency [would] not consider any third-party human studies unless a court orders it to do so." *Id.* Plaintiffs argue that *CropLife America* demonstrates that an action will be ripe where it is binding as to the issues it addresses. That appears to be a correct reading of the case, but it is inapplicable here, where the agencies have not stated unequivocally that the definition of incidental fallback and the related factors will be applied in any particular manner. Rather, EPA and the Corps have repeatedly emphasized their intention to apply the definition and the factors on a case-by-case basis.

## II. Procedural Challenge

■ Plaintiffs also claim that agencies failed to provide notice and comment on the definition of "incidental fallback" included in the rule. Plaintiffs' argument is, essentially, that the agencies ambushed the regulated community with the final Tulloch II rule, by including a "controversial and unduly narrow definition of incidental fallback that has not been vetted by public comment." NSSGA Mot., at 33. The agencies respond that the preamble to the proposed Tulloch II rule discussed all of the subjects and issues that went into formulating the final definition of incidental fallback. The federal defendants also challenge the ripeness of this issue, although they concede that this claim presents a closer ripeness question.

■ This inquiry turns on whether the language of the final rule, which included a definition of incidental fallback, was a "logical outgrowth" of the proposed rule. *Small Refiner Lead Phase–Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C.Cir. 1983); *see also Sprint Corp.*, 315 F.3d at 375–76. Determination of this issue focuses on whether the purposes of notice and comment have been served. *Small Refiner Lead*, 705 F.2d at 547. Notice serves three distinct purposes: (1) "improv[ing] the quality of agency rulemaking by ensuring that agency regulations will be tested by exposure to diverse public comment"; (2) ensuring "fairness to affected parties";

---

known as "deep ripping." *Borden Ranch*, however, is a perfect example of why claim such as this one should be allowed to ripen. In *Borden Ranch*, the district court upheld the Corp's enforcement action, after engaging in a *meticulous analysis of the facts*. 1999 WL 1797329 (E.D.Cal.). The Ninth Circuit affirmed, concluding "that deep ripping, when undertaken in the context at issue here, can constitute a discharge of a pollutant," *id.* at 815, specifically distinguishing *NMA's* ruling with a finding that "the deep ripping does not involve mere incidental fallback, but consti-

tutes environmental damage sufficient to constitute a regulable redeposit." *Id.* at 815 n. 2. A factual record like that developed in *Borden Ranch* is exactly what is needed to parse the agency's application of Tulloch II.

9. EPA continues to struggle with this issue. *See* Heidi Gorovitz Robertson, *How Many Times Do I Have to Tell You?!: EPA's Ongoing Struggle with Data From Third–Party Pesticide Toxicity Studies Using Human Subjects*, 28 Wm. & Mary Envtl. L. & Pol. Rev. 205 (2004).

and (3) "giving affected parties an opportunity to develop evidence in the record to support their objections to a rule." *Id.* (internal citations and quotations omitted). To put it another way, I must inquire whether the "interested parties reasonably could have anticipated the final rulemaking from the draft rule." *Anne Arundel County v. EPA*, 963 F.2d 412, 418 (D.C.Cir.1992) (internal citations and quotations omitted).

According to the definition included in the final Tulloch II rule, whether a particular deposit is incidental fallback depends on whether it (1) is small in volume, (2) is incidental to excavation activity, and (3) falls back to substantially the same place as the initial removal. *See* 66 Fed.Reg. at 4574. Each of these substantive considerations was discussed in the preamble to the proposed rule. *See, e.g.,* 65 Fed.Reg. at 50,110 ("Backfilling, which involves the placement of a *substantial amount* of excavated material back into the trench, ditch or hole from which it was excavated, has also been found to be a regulable discharge by the courts.") (emphasis added); *Id.* at 50,113 (citing *NMA* and *AMC* for the propositions that "incidental fallback returns dredged material virtually to the spot from which it came" and "incidental fallback is the incidental soil movement from excavation, such as the soil that is disturbed when dirt is shoveled, or the back-spill that comes off a bucket and falls back into the same place from which it was removed."). Moreover, one of the plaintiffs' comments submitted in response to the proposed Tulloch II rule requested the inclusion of an "incidental fallback" definition and addressed such issues as volume and location of redeposit, with reference to the context of excavation. NSSGA Mot., Ex. F., at 3, 7.

It appears from my review of the record that the agencies hold the better hand in this dispute. Plaintiffs "reasonably could have anticipated the final rulemaking" and, in fact, may have anticipated the precise result. However, this inquiry deserves a thorough analysis of the proposed and final rules, and it would also benefit from a deeper understanding of the real-world implications of the rule, which simply is not possible given the record before me. Accordingly, in the interest of judicial efficiency, I decline to decide this procedural issue apart from the substantive claim. *See Nat'l Ass'n of Regulatory Utility Com'rs v. United States Dep't of Energy*, 851 F.2d 1424, 1429–30 (D.C.Cir.1988).

## CONCLUSION

All the parties in this case have moved for summary judgment. Because ripeness goes to justiciability, unripe claims should be disposed of on a motion to dismiss. The Court, therefore, will treat defendant's cross-motion for summary judgment as a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and the motion will be granted. An appropriate order accompanies this memorandum.

## *ORDER*

For the reasons stated in the accompanying memorandum, defendant's motion for summary judgment [39], treated as a motion to dismiss, is **GRANTED**, and this case is **DISMISSED**. It is further ordered that plaintiff's motion for summary judgment [37] is **DENIED**; that the motion of intervenor defendants for summary judgment [40] is **DENIED AS MOOT**; and that the unopposed motion of intervenor defendants to amend the administrative record [38] is **DENIED**.

**SO ORDERED.**