# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 18, 2005         Decided August 8, 2006

No. 04-1309

STATE OF NEVADA,
PETITIONER

v.

DEPARTMENT OF ENERGY,
RESPONDENT

---

On Petition for Review of an Order of the
Department of Energy

---

*Joseph R. Egan*, Special Deputy Attorney General, State of Nevada, argued the cause for the petitioner. *Brian Sandoval*, Attorney General, *Marta A. Adams*, Deputy Attorney General, *Antonio Rossmann* and *Roger B. Moore*, Special Deputy Attorneys General, State of Nevada, and *Martin G. Malsch*, *Robert J. Cynkar*, *Charles J. Fitzpatrick* and *Paul H. Lamboley* were on brief.

*John A. Bryson*, Attorney, United States Department of Justice, argued the cause for the respondent. *Greer S. Goldman* and *Ronald M. Spritzer*, Attorneys, United States Department of Justice were on brief.

*Jean V. MacHarg*, *John C. Martin*, *Susan M. Mathiascheck*, and *Michael A. Bauser* were on the brief for *amicus curiae*

Nuclear Energy Institute, Inc. in support of respondent.

Before: HENDERSON and RANDOLPH, *Circuit Judges*; and EDWARDS, *Senior Circuit Judge*.[1]

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Since scientists split the atom in 1942, nuclear technology has proliferated into many areas of society. No longer limited to the defense of our nation, nuclear technology is used in energy production, medical diagnosis and treatment, food processing and agriculture and sterilization of consumer goods. For all of the advances it has brought, however, those advances have come at a price—the waste that is the inevitable byproduct.

What to do with the waste has plagued scientists and policymakers for decades. As a result of scientific, political and regulatory consultation and comment, the consensus is that the waste should be stored in an underground repository to be located at Yucca Mountain, Nevada (Yucca). The State of Nevada (Nevada), concerned about the storage of nuclear waste within its borders, has vigorously opposed the construction of a nuclear repository at Yucca and, after failing in the political and regulatory arenas, has attacked the statutory and regulatory scheme governing the construction and operation of the Yucca repository. *See Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251 (D.C. Cir. 2004).

In this petition for review, Nevada asks us to review both the Final Environmental Impact Statement (FEIS) and that portion of the Record of Decision (ROD) the Department of Energy (DOE or Department) issued governing the

---

[1]Senior Circuit Judge Edwards was in regular active service at the time of oral argument.

transportation of nuclear waste from the production sources to Yucca. Nevada alleges the FEIS is procedurally flawed and therefore violates the National Environmental Policy Act ( NEPA), 42 U.S.C. §§ 4321 *et seq.* It challenges the ROD under the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.* For the reasons discussed below, we conclude that some of Nevada's claims are unripe for review and the remaining claims are without merit. Accordingly, we deny Nevada's petition for review.

I.

The Nuclear Waste Policy Act of 1982 (NWPA), 42 U.S.C. §§ 10101 *et seq.*, establishes the process for locating, constructing, operating and closing any repository for spent nuclear fuel (SNF) and high-level radioactive waste (HLW). Under the statutory scheme, the DOE is responsible for the development and operation of the repository once the Nuclear Regulatory Commission (NRC) issues a license for the project under the Atomic Energy Act, 42 U.S.C. §§ 2011 *et seq.*

Pursuant to the NWPA, the DOE Secretary recommended Yucca to the President for development as the nation's underground nuclear waste repository. Following the NWPA's procedures, the President then recommended Yucca to the Congress. *See Nuclear Energy Inst.*, 373 F.3d at 1261. Nevada objected to the proposed site and submitted a notice of disapproval, to which the Congress responded by passing the Yucca Mountain Development Act, Pub. L. No. 107-200, 116 Stat. 735 (2002), a joint resolution approving the development of a repository at Yucca.

On February 14, 2002, the DOE issued an FEIS for its repository site selection decision. Although much of the FEIS concentrated on the Yucca site, it also analyzed alternatives for, and the "potential environmental consequences" of, transporting nuclear waste from the many production sources throughout the

country to the repository at Yucca. *See* U.S. Department of Energy, Final Environmental Impact Statement for a Geologic Repository for the Disposal of Spent Nuclear Fuel and High-Level Radioactive Waste at Yucca Mountain, Nye County, Nevada 6-1 (February 12, 2002) (FEIS) (Joint Appendix (JA) 244). The FEIS analyzed two interstate transportation proposals: the mostly legal-weight truck alternative and the mostly-rail alternative. The FEIS also evaluated intrastate transportation alternatives under the mostly-rail scenario to transport waste from one of Nevada's mainline railroads to Yucca because there is currently no direct rail access to Yucca.

Under the mostly legal-weight truck scenario, virtually all SNF[2] and HLW would be placed in casks[3] at the production sources and the casks then shipped by truck directly to Yucca. *See* FEIS 2-47 (JA 204). Each truck together with each cask would meet legal-weight requirements. The mostly legal-weight truck option would transport approximately 53,000 shipments over 24 years. FEIS 6-4 (JA 247).

The mostly-rail scenario, by contrast, would provide for the shipment of SNF and HLW primarily by rail. FEIS 6-35 (JA 278). There are seventy-two commercial production sources and five DOE generator sources of nuclear waste nationwide. *Id*. Sixty-six of the commercial production sources and the five DOE generator sources have the capacity to load the waste into large-capacity rail shipping casks. Forty-two of the sixty-six

---

[2]Excepted would be SNF from the Idaho National Engineering and Environmental Laboratory, which would be transported to Yucca by rail. *See* FEIS 2-47 (JA 204).

[3]The casks would be NRC-certified reusable shipping casks, FEIS 2-47 (JA 204), which would meet the requirements of 10 C.F.R. §§ 71.0-71.10, prescribing radiological performance standards for casks that are subjected to specific test conditions.

production sources also have direct rail access and would place the casks directly on the rail line while the twenty-four sources able to load the casks but without rail access would ship the waste by barge via navigable waterways or heavy-haul trucks via highways to the nearest rail line.[4] *Id.* From there the waste would travel by rail to one of Nevada's mainline railroads. Under the mostly-rail scenario some waste would have to be shipped by legal-weight trucks because at least six production sources cannot accommodate rail casks. *Id.* Waste hauled by legal-weight truck would proceed directly from the production sources to Yucca, just as it would under the mostly legal-weight truck scenario. Under the mostly-rail scenario, about 9,600 rail shipments and 1,100 legal-weight truck shipments would occur over 24 years. FEIS 6-4 (JA 247). The FEIS designated the mostly-rail scenario as the DOE's preferred alternative. FEIS 6-35 (JA 278).

As noted earlier, because none of Nevada's mainline railroads connects to Yucca, the FEIS also considered alternatives for transporting the waste from a mainline railroad to Yucca. The first option was to construct an intermodal transfer station at a point on a mainline railroad, where the rail casks would be transferred from the rail cars to heavy-haul trucks. The trucks would then haul the waste to Yucca on one of Nevada's five existing highways to Yucca. The second option was to build a branch rail line from a mainline railroad to Yucca. The DOE identified five alternative "rail corridors"—each approximately one-quarter mile wide—in which to build a branch rail line. While the FEIS analyzed the environmental impact of building a rail line somewhere within each corridor, it did not analyze the impact of specific alternative track locations within each corridor. The DOE did

---

[4]Barge shipment "could be possible" for 17 of the 24 commercial sources on or near navigable waterways. *See* FEIS 6-35 (JA 278).

not indicate a preference among the five rail corridors in the FEIS but it subsequently announced the Caliente Corridor as its preferred one. *See* Notice of Preferred Nevada Rail Corridor, 68 Fed. Reg. 74,951, 74,951 (Dec. 29, 2003) ("The Department is now announcing the Caliente rail corridor as its preferred corridor in which to construct a rail line in Nevada, and Carlin as a secondary preference.").

On April 8, 2004, the DOE issued a ROD for transporting SNF and HLW to Yucca. *See* Record of Decision on Mode of Transportation and Nevada Rail Corridor for the Disposal of Spent Nuclear Fuel and High-Level Radioactive Waste at Yucca Mountain, Nye County, NV, 69 Fed. Reg. 18,557 (April 8, 2004) (ROD). The ROD identified the mostly-rail option as the DOE's choice for the national transportation plan. *Id.* at 18,558. The Department also decided to construct a branch rail line from one of Nevada's existing mainline railroads to the repository at Yucca and selected the Caliente Corridor for any branch rail line it might decide to build. *See id.* ("In addition, the Department has decided to select the Caliente rail corridor in which to examine potential alignments within which to construct that rail line. Should the Department select an alignment within that corridor, it will obtain all necessary regulatory approvals before beginning construction." (footnote omitted)).

The ROD further noted that if the repository at Yucca became operational before a branch line could be completed, the DOE could nonetheless begin shipment of waste. Under this contingency, the waste would be shipped on legal-weight *truck* casks placed on rail cars which, once they arrived in Nevada, would be transferred to legal-weight trucks at an intermodal transfer station and then continue by truck to Yucca. The DOE did not supplement the FEIS notwithstanding this contingency, noted in the ROD, that it might transport waste in legal-weight truck casks via rail. The ROD alluded to a March 10, 2004 Supplemental Analysis (SA) the DOE had prepared, concluding

that no Supplemental Environmental Impact Statement (SEIS) was necessary because the FEIS's analysis of the mostly legal-weight truck and mostly-rail scenarios comprehended the environmental impact of an interim use of legal-weight truck casks by rail. *Id.* at 18,561 n.7.

Nevada then filed its petition for review of the FEIS and the ROD. Nevada argues that the DOE violated NEPA in several ways, that it exceeded its authority in selecting the Caliente Corridor and that its conditional decision to ship waste in legal-weight truck casks by rail, should the repository at Yucca be operational before completion of a branch rail line, was arbitrary and capricious.

## II.

Under the ripeness doctrine, "an Article III court cannot entertain the claims of a litigant unless they are 'constitutionally and prudentially ripe.' " *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999) (quoting *La. Envtl. Action Network v. Browner*, 87 F.3d 1379, 1381 (D.C. Cir. 1996)). In our review of agency action, the ripeness doctrine takes into account questions regarding "the institutional capacities of, and the relationship between, courts and agencies." *Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 915 (D.C. Cir. 1985). The questions include "the agency's interest in crystallizing its policy before that policy is subjected to judicial review," "the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting" and "the petitioner's interest in prompt consideration of allegedly unlawful agency action." *Id.* In *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967), the United States Supreme Court announced the now-familiar two-pronged test for ripeness that balances these interests. A court is to evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149. The Supreme Court has more recently elaborated on ripeness, concluding that

a court must consider "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).

A.

Nevada claims that the DOE's adoption of what Nevada calls the "interim transportation plan"—"building an intermodal capability at a rail line in Nevada to take legal-weight truck casks from rail cars and transport them the rest of the way to the repository via highway, should the rail system be unavailable at the time of the opening of the repository," ROD, 69 Fed. Reg. at 18,561—required the DOE to prepare an SEIS. The DOE is required to prepare an SEIS if, inter alia, it makes "substantial changes in the proposed action that are relevant to environmental concerns." 10 C.F.R. § 51.92(a)(1); *see also* 40 C.F.R. § 1502.9(c). Because the FEIS did not evaluate the interim transportation plan, further NEPA analysis might be required. *See* 40 C.F.R. § 1502.9(c)(1)(i). This issue, however, is not yet ripe for our review.

The DOE's discussion of the interim transportation plan in the ROD does not represent its final determination regarding the plan. As outlined in the ROD, the plan might be implemented at some future time but the DOE's language is replete with conditional phrases. *See* ROD, 69 Fed. Reg. at 18,561 ("The Department would use truck transport *where necessary*, *depending* on certain factors such as the timing of the completion of the rail line proposed to be constructed in Nevada. This *could* include building an intermodal capability at a rail line in Nevada to take legal-weight truck casks from rail cars and transport them the rest of the way to the repository via highway, *should* the rail system be unavailable at the time of the opening of the repository." (emphases added)). The DOE's uncertainty

makes it plainly premature for us to review an interim transportation plan that may never materialize. Until and unless the NRC issues a permit for a nuclear repository at Yucca—a precondition of its construction and operation—it is possible, if not probable, that the branch rail line will be constructed before the repository becomes operational. Moreover, even if it becomes operational before the branch rail line is completed, the ROD recites only that the DOE "could" implement the plan in that event. *Id.* Only when the DOE's plan has sufficiently "crystallized" and the FEIS is used to support a concrete decision will Nevada's challenge to the DOE's failure to prepare an SEIS be ripe. *See Ohio Forestry Ass'n*, 523 U.S. at 733–37 (withholding consideration of forest management plan because of uncertainty whether and to what extent plan would be used to support future logging decisions). Nor do we foresee hardship to Nevada by our withholding judicial review. *See id.* at 735 (requiring party to participate in further administrative or judicial proceedings is not sufficient hardship); *AT&T Corp. v. FCC*, 349 F.3d 692, 700 (D.C. Cir. 2003) (same).

## B.

Nevada also attacks the interim transportation plan as arbitrary and capricious. The APA requires that we set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Comtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 685 (D.C. Cir. 2004) (quoting 5 U.S.C. § 706(2)(A)). As with Nevada's claim that the DOE was required to prepare an SEIS, however, we find this claim is not ripe for review.

A claim generally satisfies the first prong of the *Abbott Laboratories* test—"fitness of the issue[ ] for judicial decision"—if "the issue tendered is a purely legal one." *Abbott Labs.*, 387 U.S. at 149. Whether an agency decision is arbitrary and capricious is a purely legal question. *See Sprint Corp. v. FCC*, 331 F.3d 952, 956 (D.C. Cir. 2003) (citing *Fox Television*

*Stations*, *Inc. v. FCC*, 280 F.3d 1027, 1039 (D.C. Cir.), *modified on reh'g on other ground by* 293 F.3d 537 (D.C. Cir. 2002)). Nonetheless, "even purely legal issues may be unfit for review," *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003), if the agency action is not "final agency action" under the APA, *see Sprint Corp.*, 331 F.3d at 956. Indeed, we have held that "[f]inal agency action pursuant to the Administrative Procedure Act is a 'crucial prerequisit[e]' to ripeness." *Id.* (quoting *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 88 (D.C. Cir. 1986), and citing *Abbott Labs.*, 387 U.S. at 149) (second alteration in original). *See also Trudeau v. FTC*, No. 05-5363, 2006 WL 2087122, *4 (D.C. Cir. July 28, 2006); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n,* 324 F.3d 726, 731 (D.C. Cir. 2003).

The ROD makes clear that the Department "could" implement the plan, not that it will, and, in any event, that it will do so only "where necessary, depending on certain factors." ROD, 69 Fed. Reg. at 18,561. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks and citation omitted). In *Fourth Branch Associates v. FERC*, 253 F.3d 741 (D.C. Cir. 2001), FERC issued a notice of its intent to initiate "surrender" proceedings (used for the implied surrender of a joint license to operate a hydroelectric plan) and Fourth Branch Associates petitioned for review. We dismissed the petition, observing "[t]here is nothing definitive in an agency's intending to do something." *Id.* at 746. So too here. The ROD, in relevant part, does nothing more than announce the DOE's intent to do something if certain conditions obtain. The interim transportation plan "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300 (internal quotation marks and citation omitted). It is not fit for judicial review because " 'further administrative action is needed to clarify the

agency's position.' " *Nat'l Treasury Employees Union v. Chertoff*, Nos. 05-5436 & 05-5437, 2006 WL 1736216, *12 (D.C. Cir. June 27, 2006) (quoting *Action Alliance of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 940 (D.C. Cir. 1986)).

Nor will Nevada suffer any hardship from delaying review. The ROD's discussion of the interim transportation plan results in no "adverse effects of a strictly legal kind"; it "do[es] not command anyone to do anything, or to refrain from doing anything; [it does] not grant, withhold, or modify any formal legal license, power, or authority; [it does] not subject anyone to any civil or criminal liability; and [it] creates no legal rights or obligations." *Ohio Forestry Ass'n*, 523 U.S. at 733. The plan is nothing more than a *possible* course of action the DOE *may* take given a *possible* turn of events. Any injury to Nevada will not occur until the DOE makes a concrete decision. *See Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967) (no hardship where "regulation merely state[d] that the Commissioner may authorize inspectors to examine certain processes or formulae" because regulation did not affect petitioner's "primary conduct"). Nor does hardship flow from the uncertainty of the DOE's implementation of the plan, *cf. Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 811 (2003) (rejecting notion that "mere uncertainty as to the validity of a legal rule constitutes a hardship for purposes of the ripeness analysis"), nor from the fact that Nevada may have to participate in additional administrative or judicial proceedings, *see Nuclear Energy Inst.*, 373 F.3d at 1313 ("[R]equiring a party to participate in further administrative or judicial proceedings is not a hardship sufficient to outweigh a determination that an issue is unfit for review.").

## C.

Nevada next claims that the DOE selected the Caliente Corridor in which to build the branch rail line without the

approval of the Surface Transportation Board (STB) and thus invaded the latter's exclusive jurisdiction over common carrier rail lines. Under the APA, we must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law [or] . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). The STB has exclusive jurisdiction over "transportation by rail carrier," 49 U.S.C. § 10501(a)(1), and a "rail carrier" is defined as "a person providing common carrier railroad transportation for compensation," 49 U.S.C. § 10102(5). The STB has determined that a "railroad is a common carrier railroad if it purports to hold itself out as a common carrier for hire and if there is an ostensible and actual movement of traffic for the public for hire. The principal test is whether there is a bona fide holding out coupled with the ability to carry for hire." *Hanson Natural Res. Co. -- Non-Common Carrier Status -- Pet. for a Declaratory Order*, Finance Docket No. 32248, 1994 WL 673712, *14 (decision served Dec. 5, 1994).

This challenge is also unripe because it is speculative. The STB's jurisdiction comes into play only if the DOE decides to operate the branch rail line as a common carrier. *See* 49 U.S.C. § 10901(a). Nevada claims that the branch rail line's construction and operation as a common carrier is a "*fait accompli.*" Pet'r's Br. 13. That decision, however, has not been made. Further, the DOE has declared that "[s]hould the Department select an alignment within [the Caliente] corridor, it will obtain all necessary regulatory approvals before beginning construction." ROD, 69 Fed. Reg. at 18,557. Nevada's threatened harm, therefore, is speculative and thus not fit for judicial review. *See Texas*, 523 U.S. at 300 ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (internal quotation marks and citation omitted)). Moreover, we can see no hardship to Nevada in delaying review because the threatened harm—operation of the branch rail line as a

common carrier without STB certification—can occur only if the DOE determines to operate the branch rail line as a common carrier. *See Nuclear Energy Inst.*, 373 F.3d at 1313 ("Nevada may raise its substantive claims against the FEIS if and when NRC or DOE makes such a final decision. Our decision to postpone consideration of Nevada's claims therefore works no hardship on Nevada sufficient to render its claims ripe.").

### III.

We now turn to the State's five remaining claims, all of which are brought under NEPA. NEPA's mandate "is essentially procedural," *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978); the statute requires each agency to assess the environmental consequences of "major [f]ederal actions" by following certain procedures during the decision-making process, 42 U.S.C. § 4332(2)(C); *see Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 193–94 (D.C. Cir. 1991). Before approving a project, an agency must prepare a "detailed statement . . . [on] the environmental impact of the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(i)–(iii). Guiding the DOE's NEPA analysis are regulations promulgated by the Council on Environmental Quality (CEQ), as well as the DOE's own regulations, which track the CEQ regulations.[5] At the "heart of the environmental

---

[5]NEPA established "in the Executive Office of the President a Council on Environmental Quality," "composed of three members who shall be appointed by the President to serve at his pleasure, by and with the advice and consent of the Senate." 42 U.S.C. § 4342. Under NEPA, the CEQ is charged with, inter alia, "develop[ing] and recommend[ing] to the President national policies to foster and promote the improvement of environmental quality to meet the conservation, social, economic, health, and other requirements and

impact statement" is the requirement that an agency "rigorously explore and objectively evaluate" the projected environmental impacts of all "reasonable alternatives" to the proposed action. 40 C.F.R. § 1502.14.

Again, we apply the APA's arbitrary and capricious standard to a NEPA challenge. *See, e.g.*, *Olmsted Falls v. FAA*, 292 F.3d 261, 269 (D.C. Cir. 2002). We apply this standard to review both the agency's procedural compliance with NEPA and the adequacy of an EIS. *See id.* (citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 376 (1989)). Under NEPA, the "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Id.* (citing *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97–98 (1983)).

A.

Before the issuance of an EIS, the responsible official "shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." 42 U.S.C. § 4332(C); *see* 40 C.F.R. § 1503.1(a) (same). Furthermore, the CEQ

goals of the Nation" and "review[ing] and apprais[ing] the various programs and activities of the Federal Government in the light of the policy set forth in title I of [NEPA] for the purpose of determining the extent to which such programs and activities are contributing to the achievement of such policy, and to make recommendations to the President with respect thereto." 42 U.S.C. § 4344(3)–(4). Because the CEQ "has no express regulatory authority under [NEPA]," *City of Alexandria v. Slater*, 198 F.3d 862, 866 n.3 (D.C. Cir. 1999)—it was empowered to issue regulations only by executive order—"the binding effect of CEQ regulations is far from clear," *TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006). The DOE accepts them as binding, as do we for purposes of this appeal.

regulations require an agency with jurisdiction by law or special expertise to comment on "statements within [its] jurisdiction, expertise, or authority." 40 C.F.R. § 1503.2. "Jurisdiction by law" is defined as "agency authority to approve, veto, or finance all or part of the proposal," 40 C.F.R. § 1508.15, and "special expertise" is defined as "statutory responsibility, agency mission, or related program experience," 40 C.F.R. § 1508.26.

Nevada contends that the DOE violated 42 U.S.C. § 4332(C) and 40 C.F.R. § 1503.1(a) by failing to consult with the STB regarding the DOE's branch rail line proposal. We do not reach the merits of Nevada's claim, however, because it has waived the argument by failing to raise it at the administrative level. As the Supreme Court has long admonished, "[p]ersons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (citing *Vt. Yankee*, 435 U.S. at 553) (alterations in original); *cf. Nebraska v. EPA*, 331 F.3d 995, 997 (D.C. Cir. 2003); *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001); *Omnipoint Corp. v. FCC*, 78 F.3d 620, 635 (D.C. Cir. 1996); *Tex Tin Corp. v. EPA*, 935 F.2d 1321, 1323 (D.C. Cir. 1991). The Court also cautioned that

> administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure references to matters that "ought to be" considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters "forcefully presented."

*Vt. Yankee*, 435 U.S. at 553–54.

Applying these principles to Nevada's petition for review, we believe Nevada's comments nowhere alerted the DOE to Nevada's contention that the DOE was obligated to consult with the STB. Although judicial review may be had if an issue was raised at the administrative level by a party other than the petitioner, *see Cellnet Commc'n, Inc. v. FCC*, 965 F.2d 1106, 1109 (D.C. Cir. 1992) ("Consideration of the issue by the agency at the behest of another party is enough to preserve it."); *see also Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 948 (D.C. Cir. 2004) (per curiam); *Reytblatt v. U.S. Nuclear Regulatory Comm'n*, 105 F.3d 715, 721 (D.C. Cir. 1997), here the voluminous administrative record contains only one lone comment regarding the STB's jurisdiction. Eureka County, Nevada noted that "it is not clear whether construction and operation of proposed rail corridors . . . would require . . . [a]pproval by the Surface Transportation Board." JA 546–47. This bare comment alerted the DOE, at most, that it might need to obtain the STB's approval to build and operate a branch rail line; it did not touch on what Nevada argues here, that is, that the DOE had a duty to *consult with* the STB. Accordingly, we conclude that Nevada has waived this argument.

B.

Nevada next contends that the DOE violated NEPA by failing to consult with the Nevada State Engineer. Under NEPA, an agency's duty to obtain the comments of state and local agencies differs from its duty with respect to federal agencies. NEPA imposes a duty on the agency to consult with and obtain written comments from the appropriate federal agencies. *See* 42 U.S.C. § 4332(2)(C); *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1022 (9th Cir. 1980) ("[T]he statute imposes on the agency a duty to obtain written comments."). And the CEQ regulations implementing NEPA not only require the proposing agency to "obtain the comments" of federal agencies with jurisdiction and/or expertise, *see* 40

C.F.R. § 1503.1(a)(1), but also affirmatively require those agencies to comment, *see* 40 C.F.R. § 1503.2. *See Warm Springs Dam Task Force*, 621 F.2d at 1022.

By contrast, NEPA itself is silent regarding an agency's duty to obtain comments from state and local agencies. The CEQ regulations, however, require the proposing agency to "[r]equest the comments of [a]ppropriate State and local agencies which are authorized to develop and enforce environmental standards." 40 C.F.R. § 1503.1(a)(2)(i). While under both NEPA and the CEQ regulations, a proposing agency must "obtain" the comments of certain federal agencies, *see* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1503.2, 1503.1(a), it must only "[r]equest" the comments of "[a]ppropriate State and local agencies," 40 C.F.R. § 1503.1(a)(2). If the agency makes a request for comments and receives none, it has met its obligation under 40 C.F.R. § 1503.1(a)(2). If, after requesting comment, the agency receives comment, NEPA then requires that "[c]opies of . . . the comments and views of the appropriate Federal, State, and local agencies . . . shall be made available to the President, the Council on Environmental Quality and to the public." 42 U.S.C. § 4332(2)(C).

Here, the DOE submitted a copy of the draft EIS, with a cover letter inviting comment, to Michael Turnipseed, the Nevada State Engineer. Thus, it "request[ed]" the comments of the "[a]ppropriate State . . . agenc[y]." *See* 40 C.F.R. § 1503.1(a)(2). The State Engineer did not individually submit any comment to the DOE. Nevada, however, submitted comments on the draft EIS (DEIS) to the DOE, acknowledging the contribution of, inter alia, the "Nevada Division of Water," the state agency headed by the State Engineer. The DOE made copies of Nevada's comments available to the President, the CEQ and the public and thus complied with 40 C.F.R. § 1503.1(a)(2) and 42 U.S.C. § 4332(2)(C).

C.

Nevada maintains that the DOE violated NEPA because it did not identify the Caliente Corridor as its preferred alternative in the FEIS. The CEQ regulations provide "that agencies shall . . . [i]dentify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference." 40 C.F.R. § 1502.14(e). Nevada interprets this provision to affirmatively require that the FEIS include a preferred alternative and therefore claims that the DOE's failure to identify one with regard to rail corridor selection violated this requirement. The DOE counters that it fulfilled its obligation under section 1502.14(e) by identifying Yucca as its preferred alternative for the site of a repository for the disposal of nuclear waste and that it was not obliged to specify preferred alternatives for any other proposed action outlined in the FEIS. The argument, thus, centers on the level of specificity required under the regulation.

We need not dissect the regulation because we believe that even if the DOE violated section 1502.14(e), the violation was harmless error. The APA provides that, in reviewing agency action, the court "shall" take account of "the rule of prejudicial error," 5 U.S.C. § 706,[6] that is, whether the error caused prejudice. We have applied the prejudicial error rule in the NEPA context where the proposing agency engaged in significant environmental analysis before reaching a decision but failed to comply precisely with NEPA procedures. *See Ill. Commerce Comm'n v. ICC*, 848 F.2d 1246, 1257 (D.C. Cir. 1988); *see also Save Our Heritage, Inc. v. FAA*, 269 F.3d 49, 59–62 (1st Cir. 2001); *Sierra Club v. Slater*, 120 F.3d 623, 637 (6th Cir. 1997); *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*,

---

[6]5 U.S.C. § 706 provides, inter alia, "the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

42 F.3d 517, 527 (9th Cir. 1994). For example, in *Illinois Commerce Commission v. ICC*, 848 F.2d at 1257, we found the agency's failure to prepare a required environmental assessment (EA) harmless error because the agency had considered environmental consequences during the rulemaking and had developed procedures for subsequent consideration in making individual authorization decisions. There, we noted, "An order to the Commission to prepare an EA or an EIS and engage in rulemaking for a third time would be a meaningless gesture, not necessary to guarantee that the Commission will consider environmental concerns when it authorizes abandonments." *Id.* (citing *Kerner v. Celebrezze,* 340 F.2d 736, 740 (2d Cir.1965) (remand for procedural error unnecessary where it would accomplish nothing "save further expense and delay")).

Similarly, we see no purpose in declaring the FEIS inadequate because of the DOE's failure to identify the Caliente Corridor as its preferred alternative therein. *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration."). NEPA's goal of ensuring that relevant information is available to those participating in agency decision-making was not frustrated by the absence of language designating the Caliente Corridor as the DOE's preferred alternative. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (NEPA "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."). The many comments submitted in response to the FEIS manifest that the public had sufficient information to comment on the five

corridors—including Caliente—the DOE evaluated in the FEIS.[7] ROD, 69 Fed. Reg. at 18,558.  Moreover, as noted earlier, the DOE subsequently announced its preferred rail corridor selection, *see* Notice of Preferred Nevada Rail Corridor, 68 Fed. Reg. at 74,951, thereby allowing the public to address comments more specifically to that Corridor.  In a December 29, 2003 Notice published in the Federal Register, the DOE stated, "The Department is now announcing the Caliente rail corridor as its preferred corridor in which to construct a rail line in Nevada, and Carlin as a secondary preference." *Id.*  To order the DOE to revise the FEIS because it failed to identify its preferred rail corridor, in the FEIS, especially in light of its later disclosure in the Federal Register, would be a "meaningless gesture." *Ill. Commerce Comm'n*, 848 F.2d at 1257.

### D.

Nevada also challenges the FEIS for failing to address rail corridor selection—i.e., in which corridor to build a branch rail line—and rail corridor alignment—i.e., where in the preferred corridor to place the tracks—in a single EIS.  It argues that corridor selection and alignment selection are "closely related" actions requiring evaluation in a single EIS under 40 C.F.R.

---

[7]Moreover, the DOE elicited public comment on its DEIS and supplemental DEIS (SDEIS).  It received more than 13,000 comments on the DEIS and the SDEIS, 3,600 of which addressed transportation issues.  *See* ROD, 69 Fed. Reg. at 18,558.

§ 1508.25(a)(1).[8] The DOE maintains that it appropriately "tiered" its proposed action under 40 C.F.R. § 1508.28.[9]

---

[8]Under 40 C.F.R. § 1508.25(a)(1), an agency must discuss "[c]onnected actions"—that is, "closely related" actions—"in the same impact statement." "Actions are connected if they;" (i) "[a]utomatically trigger other actions which may require environmental impact statements"; (ii) "[c]annot or will not proceed unless other actions are taken previously or simultaneously"; or (iii) "[a]re interdependent parts of a larger action and depend on the larger action for their justification."

[9]40 C.F.R. § 1508.28 provides:

"Tiering" refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared. Tiering is appropriate when the sequence of statements or analyses is:

(a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis.

(b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe.

The CEQ regulations encourage "tiering" for certain proposed actions.

Tiering refers to a procedure by which an agency prepares a broad EIS—called a programmatic EIS—and subsequently prepares a narrower analysis—called a site-specific EIS—of an action included in the program. The subsequent analysis need only summarize, and incorporate by reference, the environmental issues discussed in the programmatic EIS. *See Laub v. Dep't of Interior*, 342 F.3d 1080, 1088–89 (9th Cir. 2003). Tiering of a national program like the repository at Yucca recognizes the reality that its completion involves many separate sub-projects and will take many years. The agency evaluates each sub-project as it becomes ready and that evaluation can be done with "subsequent narrower statements or environmental analyses." 40 C.F.R. § 1508.28.

We have characterized a programmatic EIS as follows:

A programmatic EIS reflects the broad environmental consequences attendant upon a wide-ranging federal program. The thesis underlying programmatic EISs is that a systematic program is likely to generate disparate yet related impacts . . . . Whereas the programmatic EIS looks ahead and assimilates "broad issues" relevant to [the program], the site-specific EIS addresses more particularized considerations . . . .

*Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 159 (D.C. Cir. 1985) (quoting *Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n*, 677 F.2d 883, 888 (D.C. Cir. 1981)) (alterations in original). Under the CEQ regulations a programmatic EIS *should* be prepared if actions are "connected," "cumulative," or sufficiently "similar" that a programmatic EIS is "the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions." 40 C.F.R. § 1508.25(a). The Supreme Court has noted that 42 U.S.C. §

---

*See id.* § 1502.20.

4332(2)(C) "may require a comprehensive impact statement in certain situations where several proposed actions are pending at the same time." *Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976). It elaborated that "[b]y requiring an impact statement Congress intended to assure such consideration during the development of a proposal or—as in this case—during the formulation of a position on a proposal submitted by private parties. A comprehensive impact statement may be necessary in some cases for an agency to meet this duty." *Id.* (footnote omitted). In determining whether a comprehensive statement—that is, a programmatic EIS—is necessary, the Court considers "the extent of the interrelationship among proposed actions and practical considerations of feasibility." *Id.* at 412.

The decision whether to prepare a programmatic EIS is committed to the agency's discretion. *See Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 374 n.73 (D.C. Cir. 1981) ("Even when the proposal is one of a series of closely related proposals, the decision whether to prepare a programmatic impact statement is committed to the agency's discretion."). Only if the decision is arbitrary and capricious will we overturn it. *See Kleppe*, 427 U.S. at 412 ("Respondents conceded at oral argument that to prevail they must show that petitioners have acted arbitrarily in refusing to prepare one comprehensive statement on this entire region, and we agree."). The DOE prepared a programmatic FEIS for the entire Yucca project as authorized by 40 C.F.R. § 1508.25. Nevada claims that the FEIS wholly failed to analyze the environmental impacts of rail corridor alignment, focusing only on rail corridor selection. Not so. The FEIS analyzed both rail corridor selection and rail corridor alignment for each alternative. ROD, 69 Fed. Reg. at 18,562–64. The DOE is now preparing a site-specific EIS—namely a Caliente Corridor EIS—for rail corridor alignment as permitted under 49 C.F.R. § 1508.28. Resp't's Br. 56. The DOE has acted well within its discretion in following

the tiered approach regarding rail corridor selection and alignment and, accordingly, has not violated NEPA.

E.

Nevada's final claim is that the DOE did not take the requisite "hard look" at the environmental impacts of the DOE's rail corridor selection. *See Comtys. Against Runway Expansion*, 355 F.3d at 685 ("We review the EIS to ensure that the agency took a 'hard look' at the environmental consequences of its decision to go forward with the project . . . ." (internal quotation marks omitted)). Specifically, Nevada contends that the FEIS inadequately and incompletely analyzed the environmental effects of placing a branch rail line within each of the five alternative corridors under consideration. Although the contours of the "hard look" doctrine may be imprecise, our task is "simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Balt. Gas & Elec. Co.*, 462 U.S. at 97–98. We have recognized that a "rule of reason" applies both to an agency's identification of the available alternatives and to its examination of their relative merits. *Citizens Against Burlington, Inc.*, 938 F.2d at 196–97. We must ensure that "the statement contains sufficient discussion of the relevant issues and opposing viewpoints" and that the agency's decision is "fully informed" and "well-considered." *NRDC v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988); *see also Robertson*, 490 U.S. at 350 (agency must assure that "the adverse environmental effects of the proposed action are adequately identified and evaluated" (quotation omitted)); 40 C.F.R. § 1502.14(a) (agency is to "[r]igorously *explore* and objectively *evaluate* all reasonable alternatives" (emphases added)).

We conclude that the DOE's analysis of the environmental impacts of rail corridor selection in its FEIS is adequate. Fully one-third—more than 80 pages—of the FEIS's analysis of transportation issues addressed rail corridor impacts. ROD, 69

Fed. Reg. at 18,562–64; FEIS 6-72–156 (JA 315–399). For each of the five corridors, the DOE analyzed more than twelve different environmental factors: land use, air quality, hydrology, biological resources and soils, cultural resources, occupational and public health and safety, socioeconomic factors, noise and vibration, aesthetics, utilities, energy and material, wastes and environmental justice. FEIS 6-72–156 (JA 315–399).

Nevada points to a handful of alleged inadequacies in the FEIS related to environmental impacts on cultural resources and flood plains as well as archaeological and historic impacts. Pt'r's Br. 53–54. It is well settled that the court will not "flyspeck" an agency's environmental analysis, looking for any deficiency no matter how minor. *See Fuel Safe Wash. v. FERC*, 389 F.3d 1313, 1323 (10th Cir. 2004) (describing inquiry as "deciding whether claimed deficiencies in a FEIS are merely flyspecks, or are significant enough to defeat the goals of informed decision making and informed public comment." (internal quotation marks and citation omitted)); *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988) ("The reviewing court may not 'flyspeck' an EIS."). Moreover, as noted earlier, the FEIS is a programmatic EIS and the DOE, consistent with the CEQ's "tiering" regulations, is preparing a site-specific EIS on rail corridor alignment. Resp't's Br. 56. While the "tiering" regulations do not relieve the DOE from taking a "hard look" at the environmental impacts, including those included in a programmatic EIS, we do not think that the inadequacies to which Nevada points make the FEIS inadequate. The DOE's selection of the Caliente Corridor therefore was not arbitrary or capricious.

For the foregoing reasons, we deny Nevada's petition for review of the Department of Energy's Final Environmental Impact Statement for a Geologic Repository for the Disposal of Spent Nuclear Fuel and High-Level Radioactive Waste at Yucca Mountain, Nye County, Nevada (February 12, 2002) and its

Record of Decision on Mode of Transportation and Nevada Rail Corridor for the Disposal of Spent Nuclear Fuel and High-Level Radioactive Waste at Yucca Mountain, Nye County, NV, 69 Fed. Reg. 18,557 (April 8, 2004).[10]

*So ordered.*

---

[10]We summarily deny any claims not specifically addressed in this opinion.